**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| George Handgis and Sharon Handgis, | No. CV-23-01971-PHX-KML |
| Plaintiffs, | **ORDER** |
| v. | |
| State Farm Mutual Automobile Insurance Company, | |
| Defendant. | |

Plaintiff George Handgis was a passenger in a pickup truck insured by defendant State Farm during a motor vehicle accident. Handgis made a claim with State Farm for injuries suffered in the crash and his wife, plaintiff Sharon Handgis, made a claim for loss of consortium. Years later, the parties arbitrated the claims and the Handgises were awarded $750,000. After receiving that award, the Handgises filed this suit alleging State Farm acted in bad faith in handling their claims. State Farm moved for summary judgment in its favor and its motion is granted.

**I.      Background**

Handgis was a passenger in a pickup truck rear-ended by an unidentified vehicle on November 2, 2016. (Doc. 80-1 at 4.) Handgis suffered injuries, including the exacerbation of a pre-existing traumatic brain injury from 2012. (Doc. 82-1 at 8.) The other driver stopped only briefly and then left the scene; because his identity was unknown, the injuries fell under State Farm's uninsured motor vehicle policy. (Doc. 80-1 at 19.)

On December 5, 2016, State Farm spoke with Handgis about the accident. (Doc. 80-1 at 16–17; Doc. 80 at 2.) That day, State Farm sent Handgis a letter acknowledging the accident and his intent to pursue a claim. (Doc. 80-1 at 19.) This letter also advised Handgis that State Farm may request a sworn statement from him or an independent medical examination (IME) and would require written authorization to obtain all necessary medical bills to substantiate his claim. State Farm also told Handgis that any disputes over coverage or the damages amount would be resolved through arbitration. (Doc. 80-1 at 19.)

### A. Attempts to Receive Medical Documentation

Over the following years, State Farm made repeated attempts to obtain Handgis's medical records to evaluate his claim. On April 12, 2017, Handgis's counsel sent State Farm a letter telling State Farm he represented Handgis and asking State Farm to "open a [uninsured motor vehicle] claim and a medical benefits claim for [] Handgis" related to the November 2, 2016 accident. (Doc. 80-1 at 22.) After no further contact from either party, State Farm asked Handgis's counsel to provide a status update on his claim in a letter dated September 12, 2017. (Doc. 80-1 at 24.) On December 2, 2017, State Farm again requested an update on Handgis's claim and asked for "all medical bills, records, and reports" supporting the claim once Handgis completed his medical treatment. (Doc. 80-1 at 26.) Over the next year, Handgis continued to receive treatment but did not provide State Farm with any medical documentation. (Doc. 80 at 3; Doc. 82-1 at 8-12.)

In March 2019, State Farm retained counsel to handle Handgis's uninsured motor vehicle claim. (Doc. 80-1 at 28.) State Farm's counsel informed Handgis's lawyer of his representation and again requested Handgis's medical records and bills. (Doc. 80-1 at 28.) On July 17, 2019, after learning Handgis retained new counsel, State Farm sent that lawyer another letter again requesting all medical records and bills to evaluate Handgis's claims. (Doc. 80-1 at 30.)

On October 17, 2019, Handgis's counsel sent State Farm an uninsured motor vehicle settlement demand letter. (Doc. 80-1 at 32.) In that letter, counsel listed

approximately $95,600 in medical bills with additional supplements to follow and demanded $1,300,000 in uninsured motor vehicle limits. (Doc. 80-1 at 42–43.) Counsel did not provide any medical bills and records from before the accident, including those relating to the 2012 pre-existing traumatic brain injury. The letter noted if State Farm refused to pay the policy limits, Handgis demanded the matter go to arbitration. (Doc. 80-1 at 43.)

On November 7, 2019, State Farm's counsel acknowledged the demand letter and again requested Handgis's pre-accident medical records, noting State Farm was unable to fully evaluate his claim without them. (Doc. 80-1 at 46.) Counsel expressed State Farm's need for an IME and, understanding Handgis lived out-of-state, asked if he would be in Arizona to schedule such an exam. (Doc. 80-1 at 46.) Counsel also asked if Handgis and Sharon Handgis would be in Arizona for an examination under oath. (Doc. 80-1 at 46.) Finally, counsel acknowledged Handgis's arbitration demand but noted the arbitration provision generally is triggered when the parties cannot agree on an amount due. (Doc. 80-1 at 46.) That type of impasse had not been reached because State Farm did not have enough information to evaluate Handgis's claim without his pre-2016 medical records. (Doc. 80-1 at 47, 55.)

After still receiving no response, State Farm's counsel wrote to Handgis's counsel again on January 18, 2020 reiterating its requests for Handgis's medical records and availability for an IME and sworn statement. (Doc. 80-1 at 52.) State Farm also provided a copy of a biomechanical analysis in that correspondence. (Doc. 80-1 at 52.) Handgis's counsel acknowledged receiving the biomechanical analysis and requested a copy of certain materials referenced in the report a month later. (Doc. 80-1 at 53.) Neither communication responded to State Farm's request for additional records or medical authorizations. (Doc. 80-1 at 53.)

On April 29, 2020—over five months after State Farm requested Handgis's pre-accident medical records—Handgis's counsel provided a list of the treating providers for Handgis's 2012 brain injury and asked that State Farm prepare and forward medical

authorizations for those providers so he could sign them. (Doc. 80-1 at 49.) A few days later, State Farm's counsel provided the requested medical authorizations for Handgis's signature. (Doc. 80-1 at 53.) But Handgis did not return the signed authorizations for four months.

On September 4, 2020, nearly a year after Handgis made his arbitration demand, State Farm finally received copies of the signed medical authorizations. (Doc. 80-1 at 53.) On October 11, 2020, State Farm's counsel wrote to Handgis's counsel memorializing his attempts to obtain necessary medical records to evaluate Handgis's claim and Handgis's counsel's delayed responses. (Doc. 80-1 at 52-53.)

### B. Attempts to Obtain an IME

By January 19, 2021, State Farm had received most records it requested and believed an IME was necessary due to Handgis's prior brain injury. (Doc. 82-1 at 25.) By then, Handgis lived in Hawaii and his counsel demanded the arbitration occur there. (Doc. 82-1 at 25.) Accordingly, State Farm retained an attorney in Hawaii to take over the matter, who indicated he would subpoena Handgis's local police and medical records and depose the Handgises. (Doc. 82-1 at 27.) He also noted he would consider an IME, physician depositions, and a "more focused and comprehensible biomechanical analysis" he expected to be completed by January 31, 2022. (Doc. 82-1 at 29.) He concluded it would be "near impossible" to predict the potential outcome of this case without an IME, reviewing Handgis's medical records, and deposing him; however, in considering the "suspicious low-speed accident in which both occupants allegedly (and coincidentally) sustained major injuries" and Handgis's pre-existing injuries, State Farm's counsel recommended defending rather than attempting to settle. (Doc. 82-1 at 29.)

Over the following months, State Farm attempted to schedule an IME but was unsuccessful due to Handgis's restrictions and unresponsiveness. Handgis's counsel never acknowledged State Farm's November 7, 2019, and January 18, 2020, inquiries into scheduling an Arizona IME. By May 2021, his counsel expressed willingness for Handgis to attend an IME but only on the Big Island of Hawaii, limiting the available

physicians. (Doc. 82-1 at 33.) As of September 18, 2021, Handgis's counsel had agreed to speak to Handgis about an IME but still would not commit to completing one. (Doc. 83-1 at 11.) There is no explanation in the record why Handgis's counsel engaged in such delaying behavior.

State Farm continued to research available physicians in Hawaii and identified two. (Doc. 83-1 at 13.) One of those physicians only traveled to Hilo—two hours away from Handgis's residence in Kona—and Handgis refused to travel. (Doc. 83-1 at 13.) By June 8, 2022, State Farm attempted to hire the other available physician, but he declined the assignment. (Doc. 83-1 at 15.) State Farm was never able to arrange an IME.

### C. Arbitration and Preparation

As early as October 17, 2019, the Handgises demanded State Farm pay the policy limit or go to arbitration. (Doc. 80-1 at 32; Doc. 83-1 at 17.) By May 2022, the parties scheduled an arbitration for mid-December 2022 after months of disagreement over designating the arbitrator. (Doc. 82-1 at 35.) Because State Farm was unable to schedule an IME, it conducted an independent record review on October 19, 2022. (Doc. 80-1 at 6.) State Farm later took Handgis's deposition on November 18, 2022 (Doc. 82-1 at 37), but never took Sharon Handgis's deposition. State Farm also did not obtain a new biomechanical analysis to supplement the original report.

The week before the arbitration hearing, State Farm's counsel indicated the award was likely to be between $100,000 and $300,000. (Doc. 82-1 at 39.) State Farm did not extend an offer to the Handgises before the arbitration, in part because they "made a demand of $1.3M," did "not come off this demand," and State Farm did not "see the value [of his claim to be] that high." (Doc. 82-1 at 41.) State Farm ultimately concluded "[s]ettlement seem[ed] highly unlikely" and arbitrated the claim in December 2022. (Doc. 82-1 at 41.) On January 17, 2023, Handgis was awarded $650,000 for his injuries and Sharon Handgis was awarded $100,000 for loss of consortium. (Doc. 80-1 at 58–59.) State Farm paid the Handgises on February 7, 2023.

### D. Present Complaint

The Handgises filed their complaint on August 18, 2023 alleging State Farm breached its duty of good faith by "put[ting its] own interests ahead of [its] insured's" by failing to make an offer to settle, forcing them "to go through needless adversarial hoops and approximately three years of litigation"[1] before arbitrating the claim, failing to perform a reasonable investigation or evaluation, and "fail[ing] to consider George and Sharon [Handgis]'s interests equal to [its] own interests" causing "humiliation, inconvenience, and anxiety . . . before being forced to pay the benefits of the Policies." (Doc. 1-3 at 5–7.)

The Handgises also requested punitive damages, which they now agree not to pursue. (Doc. 1-3 at 7; Doc. 82 at 13.) On April 14, 2025, State Farm moved for summary judgment in its favor. (Doc. 80.)

## II. Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of presenting the basis for the motion and identifying evidence it believes demonstrates the absence of a genuine issue of material fact. *Id*. at 323. A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. But a non-movant cannot rest on mere allegations or denials and must instead show there is "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing

---

[1] The Handgises' reference to "three years of litigation" presumably describes the time between their second attorney's October 17, 2019 arbitration demand letter and the December 2022 arbitration. The Handgises were not actually litigating any claims pertaining to Handgis's 2016 injury during this period.

versions of the truth at trial." *Id*. at 249 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id*. at 255

### III. Bad Faith Claim

An insurer commits the tort of bad faith when it "intentionally denies, fails to process or pay a claim without a reasonable basis." *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 279 (Ariz. 2000) (quoting *Noble v. National Am. Life Ins. Co.*, 624 P.2d 866, 868 (Ariz. 1981)). To show bad faith, the Handgises must demonstrate State Farm "acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." *Id*. at 280.

"[N]egligence alone is insufficient to impose liability on an insurer for the tort of bad faith." *Trus Joist Corp. v. Safeco Ins. Co. of Am.*, 735 P.2d 125, 134 (Ariz. Ct. App. 1986). The Handgises must show State Farm acted both objectively and subjectively unreasonably. *Id.* The Handgises cannot show either.

#### A. Objective Reasonableness

The Handgises argue State Farm's conduct was objectively unreasonable because it failed to immediately conduct an adequate investigation and fully evaluate their claims. (Doc. 82 at 7–9.) In attempting to show a material dispute of fact regarding the reasonableness of State Farm's conduct, the Handgises focus on State Farm's failure to conduct an IME, to take Handgis's statement earlier, and to take Sharon Handgis's statement at all. (Doc. 82 at 7–9.) But State Farm's conduct was not objectively unreasonable because the Handgises' own behavior and unexplained foot-dragging were undisputably the driving force for the delays of which they now complain.[2]

Handgis repeatedly refused to commit to an IME or provide any flexibility as to its

---

[2] The Handgises attempt to obscure some of their delay by arguing they "did not make a claim on the Policy until October 17, 2019." (Doc. 82 at 2.) It is undisputed Handgis's counsel sent a letter dated April 12, 2017, requesting State Farm "open a UM claim." (Doc. 80-1 at 22.) The statement that they "did not make a claim" until October 17, 2019, is patently false.

- 7 -

location. State Farm asked Handgis for his availability for an IME as early as November 7, 2019 and again on January 18, 2020 after Handgis's counsel did not respond. (Doc. 80-1 at 46, 52.) Handgis's counsel later expressed willingness for Handgis to attend an IME in May 2021 but still would not commit to an IME as of September 18, 2021, nearly two years after State Farm's initial request. (Doc. 82-1 at 33; Doc. 83-1 at 11.) And after Handgis would only commit to attending an IME on the Big Island of Hawaii and State Farm found an available doctor willing to fly to Hilo (on that island), Handgis refused to drive the two hours from his home. (Doc. 83-1 at 13.)

It is unclear what more Handgis expected State Farm to do in this situation. It tried for over two years—in the face of Handgis's unwillingness to commit—to coordinate an IME to Handgis's specifications but an available and willing practitioner simply did not exist. *See Knoell v. Metro. Life Ins. Co.*, 163 F. Supp. 2d 1072, 1076 (D. Ariz. 2001) ("Plaintiff cannot refuse to cooperate in providing information and then argue that his insurance company committed bad faith by refusing to pay benefits.").

A State Farm claims adjuster assigned to the claim testified that in instances where an IME is unavailable, State Farm may settle for a records review as it did here. (Doc. 82-1 at 50, 52.) Handgis then faults State Farm for conducting the records review before he was able to provide his sworn statement without giving the reviewing physician the opportunity to speak to him. (Doc. 82 at 8.) But at no point do the Handgises argue a records review typically (or must) include a discussion with the claimant and in fact, the State Farm claims adjuster testified the "biggest difference" between a records review and IME is an IME "puts the person in front of a physician." (Doc. 82-1 at 53.)

The Handgises also argue State Farm's failure to obtain a statement under oath from Sharon Handgis was objectively unreasonable. (Doc. 82 at 8.) Yet again, State Farm told the Handgises' counsel it was interested in taking Sharon's statement on November 7, 2019, and reiterated that interest on January 18, 2020. (Doc. 80-1 at 46, 52.) And yet again, State Farm did not receive a response from the Handgises' counsel. (Doc. 83 at 7.) Separately, a State Farm claims adjuster testified she did not believe Sharon's statement

would have been "of great assistance" because the medical records "very well outlined" Handgis's "ongoing complaints." (Doc. 82-1 at 54.) The law only requires an insurer act reasonably under the circumstances, not obtain every conceivably helpful statement even if duplicative of other existing information. *Harvey Prop. Mgmt. Co., Inc. v. Travelers Indem. Co.*, No. 2:12-CV-01536-SLG, 2016 WL 8200625, at *6 (D. Ariz. May 12, 2016) (insurer not required to obtain duplicative assessment where no evidence it "could have gained any extra information").

The Handgises further argue State Farm should have obtained a new biomechanical expert report because State Farm's own lawyer described the initial biomechanical report as "overly academic and unnecessarily complicated" and "almost useless." (Doc. 82 at 8.) But State Farm's counsel's criticisms of the biomechanical expert report were concerned with its style rather than its substance. (Doc. 82 at 8.) The undisputed facts remain that a biomechanical report generally is helpful in investigating a claim like Handgis's and such a report was prepared in this case. (Doc. 82-1 at 62–63, 68–69.) That State Farm may have preferred a clearer biomechanical expert report but opted to forgo it when there was no reason to doubt the first report's substance does not render State Farm's actions objectively unreasonable. *Voland v. Farmers Ins. Co. of Arizona*, 943 P.2d 808, 814 (Ariz. Ct. App. 1997) ("Because the carriers had a reasonable basis for their actions, they cannot be liable for bad faith.").

Although Handgis argues another biomechanical expert report "would have been helpful" in evaluating his claim, he does not explain what crucial information an additional report would have produced. And again, an insurer is not required to do everything that "would have been helpful" to evaluate a claim, only what a reasonable insurer would be expected to do under the circumstances. *Trus Joist*, 735 P.2d at 134.

The Handgises also argue State Farm failed to reasonably evaluate their claims because State Farm claims adjusters testified they relied on counsel's claim evaluation, which was "not noted in State Farm's file until December of 2022." (Doc. 82 at 9.) That argument distorts the claims adjusters' testimony. (*See, e.g.*, Doc. 82-1 at 68–69 (claims

adjuster testified she relied on State Farm's counsel's assistance to seek an IME, biomechanical report, and sworn statements of the Handgises but did not "do any activities independent of defense counsel.").) The Handgises do not identify any law or facts supporting their assumption that State Farm's claim adjusters are not permitted to work with the attorney that State Farm hired specifically to assist with the adjudication of this claim.

Finally, the Handgises argue State Farm took "nearly two years" after it received most of Handgis's prior medical records to evaluate the claim. (Doc. 82 at 9.) This again distorts the facts. Even taking Handgis's counsel's settlement demand letter of October 17, 2019 as the start date for processing the claim, State Farm—within a month—requested Handgis's medical records and availability for an IME so that it could begin its evaluation. (Doc. 80-1 at 46.) After receiving no response, State Farm reiterated its request on January 18, 2020. (Doc. 80-1 at 52.) After months of additional delays attributable to the Handgises, State Farm finally received signed medical authorizations on January 19, 2021, more than a year after its initial request. (Doc. 80-1 at 53; Doc. 82-1 at 25.)

After that point, the Handgises argue State Farm evaluated their claims too slowly because State Farm's counsel did not relay his final evaluation of their claims until December 2022. (Doc. 82 at 10.) But Handgis's counsel was still waffling on whether Handgis would commit to an IME as of September 18, 2021 (Doc. 83-1 at 11) and set geographical requirements for the exam that were challenging (if not impossible) to meet. (Doc. 82-1 at 33.) What the Handgises fail to acknowledge, again, is how their own delays contributed to State Farm's speed. After receiving the records in January 2021, State Farm concluded an IME was warranted and took steps to schedule the exam. (Doc. 82-1 at 25.) After months of searching and negotiations, it only became clear in June 2022 that no physician within Handgis's specifications was available. (Doc. 83-1 at 15.) State Farm then sought a records review as the next-best option for evaluating the Handgises' claims, the results of which it did not receive until October 19, 2022.

1  (Doc. 80-1 at 6; Doc. 82-1 at 50, 52.) Handgis was deposed on November 18, 2022.
2  (Doc. 82-1 at 37.) It was only then that State Farm had gathered all necessary information
3  to evaluate the claim and its lawyer came to his conclusion about the value of the claims
4  the following month. This is a far cry from the ten months the Arizona Supreme Court
5  held unreasonable in *Zilisch*, the case on which the Handgises almost exclusively rely.
6  *See Zilisch*, 995 P.2d at 280 (finding insurer was unreasonable where it delayed
7  processing claim by ten months by insisting on reviewing report that did not exist and
8  after degree of injury was undisputed); *see also Montoya Lopez v. Allstate Ins. Co.*, 282
9  F. Supp. 2d 1095, 1101 (D. Ariz. 2003) (insurer did not evaluate claim unreasonably
10 when claimant caused delay of approximately one month).

### B. Subjective Reasonableness

The Handgises also cannot show State Farm knew or was conscious of the fact that its conduct was unreasonable. *Zilisch*, 995 P.2d at 280. As best as the court can understand, the Handgises argue State Farm acted subjectively unreasonably for largely the same reasons it acted objectively unreasonably. (Doc. 82 at 10.) For the same reasons discussed above, these actions do not create a question of fact regarding State Farm's subjective reasonableness.

State Farm also did not knowingly or consciously act unreasonably by failing to make a settlement offer. For years, counsel for the Handgises repeatedly told State Farm they would not accept less than the policy limits, *i.e.* $1,300,000. (Doc. 80-1 at 42–43; Doc. 83-1 at 17.) If State Farm did not comply, the Handgises demanded arbitration. (Doc. 80-1 at 42–43; Doc. 83-1 at 17.) State Farm owes the Handgises a "duty to treat settlement proposals with equal consideration to its interests and those of an insured." *Safeway Ins. Co. v. Guerrero*, 106 P.3d 1020, 1024 (Ariz. Sup. Ct. 2005) (quotations omitted). But after receiving Handgis's previous medical records and deposing Handgis, State Farm simply did not believe an arbitrator would value the claim at the policy limit (Doc. 82-1 at 27, 41). *See Montoya Lopez*, 282 F.Supp.2d at 1103 (insurer did not act in bad faith by going to arbitrator where insured "demanded arbitration"). That belief

proved correct when the arbitrator in fact *did* value the claim below the policy limit.

Finally, the Handgises argue State Farm knowingly or consciously acted unreasonably because its counsel "indicated the likely arbitration award could be as much as $300,000.00" but "chose not to offer any compensation" because it concluded settlement was "highly unlikely." (Doc. 82 at 11.) Legally, even if a portion of the Handgises' settlement demand were undisputed, State Farm was not obligated to pay it prior to arbitration. *See Voland*, 943 P.2d at 811, 814. And factually, the Handgises again distort the record. State Farm's counsel advised the arbitration award could be as much as $300,000, but recommended defending from the outset of the case. (Doc. 82-1 at 29.) State Farm expressed an openness to "any potential reduction in [settlement] demand," but the Handgises never hinted they were interested in doing so. (Doc. 82-1 at 41.) State Farm accepted the conclusions of its counsel and ultimately resolved the claims through arbitration for approximately half of the Handgises' demand. (Doc. 80-1 at 59.) No reasonable juror could find State Farm acted knowingly or consciously that its conduct was unreasonable because its conduct was not unreasonable and was vindicated by the arbitrator's award, which it promptly paid.

The Handgises cannot show State Farm acted objectively or subjectively unreasonably in its handling of their claim. Therefore, State Farm's motion for summary judgment is granted.

Accordingly,

**IT IS ORDERED** State Farm's Motion for Summary Judgment (Doc. 80) is **GRANTED**. The Clerk of Court is directed to enter judgment in favor of State Farm and close this case.

Dated this 29th day of July, 2025.

Honorable Krissa M. Lanham
United States District Judge